# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ANTHONY CRENSHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-413-WKW-DAB** |
| | ) | |
| **CITY OF WETUMPKA, AL.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | | |

| | | |
|---|---|---|
| **CECELIA DIXON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-696-WKW-DAB** |
| | ) | |
| **CITY OF WETUMPKA, AL.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant City of Wetumpka's Motion for Summary Judgement (Doc. 21), Defendant's Memorandum Brief in Support of Motion for Summary Judgment (Doc. 22), Exhibits filed in support (Docs. 21-1–21-21), and Plaintiffs' memorandum and exhibits in opposition to the motion (Doc. 23).  Oral argument on the motion was conducted February 28, 2017.

Plaintiff Anthony Crenshaw (Crenshaw) filed suit in June 2015 against the City of Wetumpka (the City or Defendant) asserting claims for retaliation under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000(e), *et seq*. (Title VII),  and the Age Discrimination in Employment Act (ADEA).  (Doc. 1).  Crenshaw alleges he suffered two adverse employment actions for engaging in statutorily-protected activity of opposing and refusing to participate in the scheme of Mayor Jerry Willis'

(Willis) efforts to "get rid of" the City's Chief of Police, Cecelia Dixon (Dixon) because she was an "old, overweight woman."  (Doc. 1).

In September 2015, Dixon filed her three-count complaint against the City alleging gender discrimination under Title VII, age discrimination in violation of the ADEA, and violation of Alabama's Age Discrimination in Employment Act (AADEA).  (Case No. 2:15-cv-696-WKW-DAB, Doc. 2).  In both cases, the City denied the allegations of unlawful conduct.  (Case No. 2:15-cv-413-WKW-DAB, Doc. 6; Case No. 2:15-cv-696-WKW-DAB, Doc. 4).  Thereafter, the two cases were consolidated.  (Doc. 13).

The City now moves for summary judgment as to both Plaintiffs claiming: (1) Crenshaw's retaliation claims fail because he does not allege an actionable claim based on his placement on administrative leave, there is no causal relation between Crenshaw's alleged opposition and his placement on leave, and the City has articulated legitimate, non-retaliatory reasons for Crenshaw's demotion; (2) Dixon's discrimination claims fail because she is not an "employee" and is exempt from the protections of Title VII and the ADEA; (3) Dixon's age claim fails because she was replaced by an individual who is older than she is and there is no evidence the decision to dismiss Dixon was based on her age; and (4) even if Title VII applies and Dixon could present a *prima facie* case, the City has articulated a legitimate, non-discriminatory reason for her dismissal.   (Doc. 22).  For the reasons that follow, the undersigned recommends Defendant's motion for summary judgment be **denied**.

## I.    JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331, 1343(a)(3); 29 U.S.C. § 626(c)(1); and 42 U.S.C. § 2000e-5(f)(3) as to Plaintiffs' federal causes of action.   The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both.  *See* 28 U.S.C. § 1391.   On January 5, 2017, the above-styled consolidated matter was referred to the undersigned for review by United States District Judge William K. Watkins. (Doc. 31); *see also* 28 U.S.C.

§ 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507 (11th Cir. 1990).

## II. FACTUAL BACKGROUND

The matters set forth here are either undisputed or stated, as they must be for purposes of the present motions, in the light most favorable to Plaintiffs, the non-moving parties. Dixon, who was born in 1958, was hired at the age of fifty to be the Chief of Police of the Wetumpka Police Department. (Docs. 21-1; 21-7 at 3, 8). She was appointed by the City Council, whose members included Willis, at a meeting conducted in February 2009. Prior to applying for the Chief of Police position, she worked for over twenty-eight years as an officer with the Montgomery Police Department. (Doc. 21-7 at 16:6–18:1). She learned of the Wetumpka Chief of Police position through her friend Danny Billingsley (Billingsley), who worked for the Attorney General's Office but was also applying for the Chief of Police position.[1] *Id.* at 27:12–28:1. Dixon applied for the position at the City Council meeting on February 20, 2009. (Doc. 29-1, ¶ 2). She states Willis contacted her prior to the February 2009 City Council meeting to thank her for her application and let her know she did not need to come to the meeting as the City had "decided to go another direction." *Id.* Willis told her the City needed someone who could work longer and he did not think Wetumpka was ready for a woman police chief. (Doc. 21-7 at 29:6–9).

At the February 20, 2009, City Council meeting, Dixon was unanimously voted to be Chief of Police for the City of Wetumpka. (Doc. 21-1). She was the only female of the three candidates considered. (Doc. 21-7 at 31:11–16). Billingsley withdrew his application at the meeting. (Doc. 21-9 at 11:14–12:12). Willis voted for Dixon, but prior to the meeting, he had advocated for the other candidate, Jeremy Amerson. *Id.* at 12:8–22.

---

[1] Billingsley decided not to pursue the position because the pay was too low. (Doc. 21-7 at 28:11–23; Doc. 21-9 at 12: 2–7).

Kathy Holt (Holt), a council member who sat next to Willis at the meeting in which Dixon was appointed, testified that, "As soon as we voted for her, [Willis] turned to me and said, she's a woman and she's too old for this position." (Doc. 23-2 at 15:8–13).   Holt testified that following the meeting when people were outside congratulating Dixon, Willis came up to Dixon, pointed his finger at her face and said, "[Y]ou better watch your back."  *Id.* at 19:10–15.

As Chief of Police, Dixon reported to Willis.  (Doc. 21-18).   Responsibilities of the position included to plan and approve all law enforcement activities for the City; prepare department budgets, goals, and objectives; coordinate all phases of department operations; interview candidates for department positions; assign duties to and supervise personnel in carrying out duties; and ensure proper maintenance of reports, files, and records.  *Id.*  At all times while she was Chief of Police, Dixon was a law enforcement officer certified by the Alabama Peace Officers Standards Training Commission.  (Doc. 29-1, ¶ 14).

Karen Stewart, the wife of a Wetumpka Police Department officer, testified Willis told her he "had nothing to do with hiring [Dixon], but" he said, "I will have something to do with firing her."  (Doc. 23-3).   Willis told Stewart that Dixon would not be hiring her own Deputy Chief of Police, and he intended to pick who he wanted in the position.  *Id.*

Crenshaw was hired as the Deputy Chief of Police by Willis in April 2009.  (Doc. 21-8 at 8:7–13).   Willis did not consult Dixon before hiring Crenshaw.  (Doc. 21-7 at 49:5–50:2).  On or about Crenshaw's first day of work, Willis summoned Crenshaw to his barber shop and told him that, "You're my man, and you're going to help me get rid of what I don't want."  (Doc. 21-8 at 8:18–19).  Willis told Crenshaw that the City Council had given him what he did not want, "an old, overweight woman." *Id.* at 19:12–20.  Crenshaw knew it was not right, but did not respond at that point.  *Id.* at 19:21–20:7.  Months later in 2010 when Willis again brought it up, saying others will help him, Crenshaw told Willis that he

could not take part in that.  *Id*. at 20:11–13.  Crenshaw told Willis, "I am not made that way."  (Doc. 23-11, ¶ 3).

Numerous times following that meeting, Willis threatened Crenshaw saying, "You won't talk to me, but others will."  *Id*., ¶ 5.  Willis repeatedly made this comment to Crenshaw at weekly meetings Crenshaw attended with Willis until Crenshaw was put on administrative leave in July 2014.  *Id.*  The last time that threat was made by Willis was on June 5, 2014.  (Doc. 1, ¶ 7).  Crenshaw saw a photograph his lawyer had taken of Willis in discussion behind the City Hall with Officers Gumpf and Blackburn in October 2014.  (Doc. 23-11, ¶ 4).

Percy Gill, a City Council member, testified that Willis told him he was disappointed about Dixon being hired because "he didn't feel like a woman needed to take on that responsibility."  (Doc. 23-4 at 6:20–22).  Gill testified Willis did not get along with Dixon and Willis wanted to get rid of her.  *Id.* at 7:16–8:9.

According to Dixon, since the moment she was hired, Willis has been waging a campaign to undermine her and have her terminated by the City Council.  (Doc. 29-1).  She was treated disparately from her similarly-situated male counterpart—the Fire Chief.  *Id.*, ¶ 5.  The Fire Chief was allowed to wear shorts and tennis shoes while she was required to wear full Class A uniform.[2]  (Doc. 21-7 at 130:11–131:6).  Dixon was regularly excluded from staff meetings and department head meetings held by Willis.  (Doc. 29-1, ¶ 6).  Willis intentionally withheld information necessary for Dixon to perform her duties, such as failing to notify her of joint meetings of first responders from other state and local agencies.  (Case No. 2:16-cv-696-WKW-DAB, Doc. 2, ¶ 10).

In April 2011, Willis openly criticized Dixon's advice to a group of senior citizens.  *Id.*, ¶ 11.  In May 2011 a meeting of first responders and emergency management officials was held and Willis

---

[2] Holt testified both of the male police chiefs before and after Dixon were also permitted to wear "khakis and Polo shirts" while Dixon was required to be in full Class A uniform.  (Doc. 23-2 at 83:19–84:7).

instructed Dixon not to attend the meeting. *Id.* On at least one occasion, Willis told the City Council he had not been notified of an incident occurring in the City of Wetumpka despite the fact that Dixon had all incident reports delivered to Willis daily. *Id.*

Dixon claims that throughout her tenure, Willis usurped her authority and questioned members of the police department about what they did not like about her. *Id.*, ¶ 12. Willis encouraged officers to complain about Dixon and deliberately attempted to create discord in the department. *Id.*

In November 2011, Willis told another officer to "hang on" and that "there would only be ten more months" after which she would be gone. *Id.*, ¶ 13.

On January 22, 2013, Dixon was unanimously reappointed as Chief of Police by the City Council of which Willis was a member. (Doc. 21-4). Willis testified he informed the new council members he would like Dixon to remain as Chief of Police. (Doc. 21-11, 8:3–12). Dixon testified Willis' plans to terminate her were already in the works, and rather than let her term come to an end, he allowed the reappointment in order to humiliate and embarrass her through an investigation and termination. (Doc. 21-7 at 163:2–16).

In January 2014 Willis reprimanded Dixon for making a statement that was published in the newspaper that the City of Wetumpka was a safe place to live. (Doc. 29-1, ¶7). She received a written warning. (Doc. 23-5). Willis restricted her ability to do her job by forbidding her from hiring new officers, directing her not to move officers from one shift to another, and refusing to ask City Council for equipment she requested for the officers. (Doc. 29-1, ¶ 8). Willis began hiring police department personnel without consulting Dixon. (Case No. 2:16-cv-696-WKW-DAB, Doc. 2, ¶ 16).

Dixon claims Willis made attempts to ostracize Dixon by directing other department heads not to sit next to Dixon and telling others he hoped she got fired. Willis enlisted the aid of others to get rid of Dixon in exchange for his political support. *Id.*, ¶ 19. Candidates that Willis helped get elected to the

City Council later voted to terminate Dixon.  *Id.,* ¶ 21.   Willis offered favors to officers terminated or disciplined by Dixon in exchange for their statements of complaint about her.  *Id.,* ¶ 22.

On July 10, 2014, City Council member Rebecca Thornton was contacted by Wetumpka Officer Gumpf regarding complaints about Dixon and Crenshaw.  (Doc. 21-11 at 11:1–13:23).  The City hired an investigator to investigate complaints made by officers about Dixon and Crenshaw.  (Doc. 21-3).  Three of the five original complainants later received promotions approved by the mayor without the normal testing procedures that go into promotions.  (Doc. 29-1, ¶ 9).  The City denies Willis' involvement or knowledge of the investigation.  (Doc. 21-9 at 62:7–63:2).  On July 21, 2014, Willis relieved Dixon of her duties and directed her to exit city property and leave behind all of her city possessions.  (Docs. 21-7 at 117:17–22; 21-21).

Dana Hill led the investigation and interviewed and took statements from thirty-one individuals. (Doc. 21-3).  The majority of the complaints were made by five male Caucasian officers currently employed with the Wetumpka Police Department who originally approached Thornton.  (Doc. 21-10 at 64:12–19).  The Hill report noted, "Because of their race, age, and gender, the credibility of their complaints may be largely scrutinized."  (Doc. 21-3 at 8).  Dixon submitted responses to the charges made against her, but her responses were not included in the Hill report, nor were they supplied to the City Council.  (Docs. 21-11 at 52:8–13; 21-12 at 24:3–8; 23-4 at 72:11–16).  The Hill report found evidence to support that Dixon directed others to monitor the activities of the Fire Chief, directed officers to not talk to Willis, instructed employees to report to her or Crenshaw if employees were talking to Willis, encouraged officers to not write tickets to people she knew, temporarily demoted officers, and engaged in unprofessional behavior including threats of bodily harm, yelling, and personal attacks. (Docs. 21-3; 21-10 at 67:6–9).

Dixon states she had received complaints about inappropriate activity of the Fire Chief concerning his not being at work during work hours.  (Doc.29-1, ¶ 10).  She investigated the allegations per standard procedure.  *Id.*  Additionally, she observed him drive his city vehicle after drinking alcohol.  *Id.*

On October 2, 2014, a meeting of the City of Wetumpka City Council was held, and the council voted, without discussion, to terminate Dixon based on the report of the investigator.  *Id.*, ¶ 11.  Dixon was terminated on that day.  *Id.*  The City Council appointed Billingsley, a 68-year old male, to replace Dixon as Chief of Police.  (Doc. 21-20).

On multiple occasions during Crenshaw's employment, Willis threatened to fire him.  (Doc. 1, ¶ 8).  Crenshaw claims Willis carried around what was purportedly a copy of a 2011 Alabama Supreme Court case in which the court held that the mayor in a mayor-council form of government had appointing authority which could not be taken away by the council.  *Id.*  According to Crenshaw, for about six months following the issuance of that opinion, Willis periodically shook a copy of the case at Crenshaw saying, "I hired you and I can fire you."  *Id.*

Crenshaw asserts that Willis subverted his authority as Deputy Chief.  One example involved the hiring of Bo Mann as a police officer in 2013.  *Id.*, ¶ 9.  Willis directed Dixon and Crenshaw to hire Mann despite their belief he was not the best candidate for the position.  *Id.*  During his interview, Mann relayed that he had heard about the job opening from Willis.  *Id.*  Later in 2014, Mann was one of the few officers that lodged complaints against Crenshaw and Dixon.  *Id.*

In July 2014, Crenshaw contacted Willis about a request for an off-duty police officer from the pastor at his church.  *Id.*, ¶ 10.  Willis told Crenshaw to assign an on-duty officer to the church during services.  *Id.*  Crenshaw told Willis this would not be possible or legal.  *Id.*  Willis sent an email to the City Council misrepresenting the situation by stating Crenshaw would not allow an on-duty police officer to "patrol" the west side churches.  *Id.*  When Crenshaw called Willis to clear up the misunderstanding, Willis told him they could not talk because Crenshaw had failed to do what he was supposed to do since

becoming Deputy Chief.  *Id.*  Crenshaw alleges this was a clear reference to his failure to help Willis get rid of Dixon.  *Id.*

On July 21, 2014, Crenshaw was relieved of his duties by Willis and told to turn in his badge and all city property and to leave the police department premises.  *Id.*, ¶ 11.  Crenshaw remained on paid administrative leave until November 19, 2014, when he was demoted from Deputy Chief of Police to Lieutenant and assigned to the detective division.  (Doc. 23-11, ¶ 6).  While he was on administrative leave, Crenshaw heard in September or October 2014 that Willis intended to seclude Crenshaw by assigning him to a junior high school as a school enforcement officer.  Crenshaw later learned he was to be assigned alone to Wetumpka Middle School as a school resource officer for the 2014-2015 school year.  (Doc. 1, ¶ 13).

## III.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## IV.    DISCUSSION

### A.    *Dixon's Status as an "Employee"*

Title VII makes it unlawful for an employer to discriminate against an employee because of her sex. *See* 42 U.S.C. § 2000e–2(a). Title VII, as amended in 1972, defines an "employee" as:

> an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f) . In 1974 Congress amended the ADEA, adopting verbatim the definition of employee found in Title VII. *Compare* 29 U.S.C. § 630(f), *with* 42 U.S.C. § 2000e(f). Accordingly, the analysis of Dixon's status as an "employee" is the same under Title VII and the ADEA.

The City argues all of Dixon's claims fail because she is an appointee on the policy making level and therefore is excepted from the definition of an "employee" under Title VII and the ADEA. (Doc. 22 at 14–16).

Dixon responds that the exception to the statute relied upon by the City has its own exception that applies here. As stated in the statute, "[t]he exception set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision." 42 U.S.C. § 2000e(f). Because she is a law enforcement officer certified by the State of Alabama, Dixon submits she is subject to the civil service laws of Alabama and is therefore exempted

10

from the "appointee" exception.  In support, Dixon references an excerpt from Wetumpka's Personnel Rules which states generally that Alabama law enforcement officers shall be afforded the same due process as classified employees as it relates to disciplinary action and rights of appeal.  *See* (Doc. 23-10).

The City relies on the same excerpt which states in an earlier sentence that "other unclassified employees are not covered by the progressive disciplinary policy, and serve at the will of the City."  (Doc. 28 at 13).  The City cites to ALA. CODE § 11-43-187, which provides "the merit system may exempt from its provisions the chief of police and the deputy chief."  Because the Wetumpka Rules stated "other unclassified employees" are not covered and since the City has no ordinance specifically including the Chief of Police in the civil service laws, the City claims these facts establish Dixon is not subject to the civil service laws.

Alabama case law reveals that some Alabama cities have specifically included a provision in their regulations that police chiefs are governed by civil service laws.  *See, e.g., Ex parte City of Florence*, 417 So. 2d 191, 194 (Ala. 1982) (referencing legislation that created the Civil Service Board of the City of Florence and which specifically states, "[t]he Police Department and the Fire Department and all officers and members of said Departments, in Florence, Alabama, including the chiefs of said Departments, shall be governed by civil service regulations under the direction and supervision of a board as hereinafter provided").  The minimal excerpt submitted here makes reference to law enforcement as defined under Alabama law, which includes police chiefs, being afforded the same due process as classified employees.[3] In contrast, the City contends Dixon is one of the "other unclassified employees" referenced earlier in that provision and is therefore not subject to the civil service laws.  The parties have not submitted the

---

[3] Under Alabama law, the term "law enforcement officer" is defined as "an official who is certified by the Alabama Peace Officers' Standards and Training Commission who has authority to make arrests and who is employed by any municipality in the state as a permanent and regular employee with law enforcement duties, including police chiefs and deputy police chiefs. The term does not include any person elected by popular vote, any person who is serving a probationary period of employment, or any person whose term of office has expired." ALA. CODE § 11-43-231.

entire document, any case law supporting their interpretation of the document, or any other evidentiary support for their interpretation of this provision and how it relates to the Title VII exception to the exemption.   On the record before the court, the court is unable to determine on this motion the applicability of the civil service law exception to the appointee exemption.

Alternatively, Dixon argues that the exception applies to only those people who advise an elected official in the exercise of Constitutional or legal powers which she claims she does not.  In support Dixon quotes legislative history of Congress' expansion of Title VII's application to state and local governmental employees, which explained the exemption "is intended to be construed narrowly." (Doc. 23 at 16) (citing 118 CONG. REC. at 7166–67 (daily ed. Mar. 6, 1972) Section-by-Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972).

Dixon's status as an "employee" within the meaning of Title VII is a question of federal, rather than state, law. *Calderon v. Martin County*, 639 F.2d 271, 272 (5th Cir., Unit B, 1981).[4]  As this Circuit previously held as it relates to whether an employee falls within the "personal staff" exemption to Title VII, the applicability of the exemption "is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand.  State law is relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired."  *E.E.O.C. v. Reno*, 758 F.2d 581, 584 (11th Cir. 1985) (quoting *Calderon*, 639 F.2d at 272–73) (internal citations omitted).

Federal case law and legislative history support a narrow interpretation of the exemption from the definition of "employee" under Title VII.  *See Teneyuca v. Bexar County*, 767 F.2d 148, 152 (5th Cir. 1985) (citing to the conference report on this legislation and noting that "consideration of these factors [courts find significant in determining the applicability of the exception to the definition of 'employee'

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

under Title VII] must be tempered by the legislative history of this provision which indicates that the exception is to be narrowly construed.").

The City cites cases from other jurisdictions in which courts have concluded a chief of police and fire chief were exempt from Title VII (Doc. 22 at 16), but the City has not provided the court, nor has this court's research found, any case based on Alabama law that expressly excludes a chief of police from Title VII's definition of "employee."  Indeed, in *Patrick v. City of Florala*, 793 F. Supp. 301 (M.D. Ala. 1992), the court found the issue to be fact-driven.  In that case, the defendant city argued that the plaintiff's Title VII claims should be dismissed because the chief of police plaintiff "occupied a policymaking position exempt from the coverage of Title VII." *Id.* at 305.  Denying defendant's request for dismissal, the court noted the exact nature of plaintiff's position is a "highly factual" one. *Id.* (citing *Teneyuca*, 767 F.2d at 153 (finding that the "highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by summary judgment")).

It appears undisputed Dixon was an appointee, but the responsibilities and status of her position are otherwise in dispute.  The City cites three factors other circuits have considered in making the determination whether an appointee is on the "policy making level," including whether (1) the appointee had discretionary or solely administrative powers, (2) the appointee served at the pleasure of the appointing authority, and (3) the appointee formulated policy.  (Doc. 22 at 15) (citing *Stillians v. Iowa*, 843 F.2d 276, 278 (8th Cir. 1988)).  The Eleventh Circuit elaborated on the "policy-making level" exemption in discussing an assistant state attorney position, stating "the position, as ordained by Florida statutes, is clearly one of policy-making level, involving one who necessarily advises, and acts upon, the exercise of constitutional and legal powers of the office of the state attorney."  *Reno*, 758 F.2d at 584. Although Dixon served at the pleasure of the appointing authority, she disputes that she actually formulated policy or served as an advisor to Willis or the City Council "with respect to the exercise of

13

the Constitutional or legal powers of the office."  (Doc. 23 at 16).  The court notes other district courts have also considered "whether the appointee is empowered to act and speak on behalf of a policymaker." *See Conley v. City of Erie, Pa*., 521 F. Supp. 2d 448, 455 (W.D. Pa. 2007); *Costenbader–Jacobson v. Commonwealth of Pa.*, 227 F. Supp. 2d 304 (E.D. Pa. 2002).  Still other courts have emphasized the need for the individual to be "appointed by an elected official to a policy making position." *Crumpacker v. Kansas Dep't of Human Res.*, 474 F.3d 747, 752 (10th Cir. 2007) (quoting *Anderson v. Albequerque*, 690 F.2d 796, 800 (10th Cir. 1982)).

Despite the range of factors considered by courts, it is clear the law requires a narrow interpretation of the exemption and a fact-driven analysis.  Given the material facts in dispute here as to the nature of Dixon's position and her actual role, the court concludes summary judgment would be improper on the issue of Dixon's status as an "employee" and whether her position comes within the policy maker exception to Title VII and the ADEA.  Thus, it is recommended the motion be denied on this issue.

B.      *Dixon's Age Discrimination Claims*[5]

The ADEA makes it unlawful for an employer to discharge "any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The prohibition in this statute applies to individuals who are at least 40 years of age.  29 U.S.C. § 627(a).  "A plaintiff may establish a claim of illegal age discrimination through either direct evidence or circumstantial evidence."  *Van Voorhis v. Hillsborough County Bd. of County Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008).

---

[5] Dixon asserts claims under the ADEA and the AADEA.  Because the analytical framework applicable to ADEA claims is the same for AADEA claims, *see Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007), the court need not undertake a separate analysis of Dixon's AADEA claim.

14

In its motion, the City primarily analyzes Dixon's age claims based on circumstantial evidence. In her pleadings, however, Dixon attempts to present both direct and circumstantial evidence of age bias. Dixon offers the testimony of council member Holt who said Willis told her he did not want Dixon as police chief because, "she's a woman and she's too old for this position," (Doc. 23-2, 15:8–13), and the testimony of Crenshaw who stated that Willis complained the City Council gave him something he did not want—"an old, overweight woman"—and he wanted Crenshaw to help him "get rid of her."  (Doc. 21 at 19:12–20).  Dixon also cites Willis' statement to her that the City was looking for someone who could work longer (Doc. 21-7 at 29:6–9), and Willis' comment to Karen Stewart that he "had nothing to do with hiring [Dixon], but [he] will have something to do with firing her."  (Doc. 23-3).

The City argues that even if Willis' statements were true, which he denies, the discriminatory remarks do not constitute direct evidence if they were not related to the challenged employment action or were not made by the decision maker.  *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998).  The City submits that because there is no evidence that the City Council members *and* Willis made the comments or that the remarks were related to the employment decision, Dixon's age claims fail.  (Doc. 22 at 19).  Given Plaintiffs' allegations that certain City Council members voted how Willis voted, a factual dispute exists as to who, in effect, the ultimate decision maker was.

The Eleventh Circuit has defined "direct evidence of discrimination" as "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption."  *Earley v. Champion Int'l Corp*., 907 F.2d 1077, 1081 (11th Cir. 1990) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989)).  "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *Carter*, 870 F.2d at 582; *see Earley*, 907 F.2d at 1081 (11th Cir. 1990) (management memorandum saying, "Fire Earley— he is too old" would be example of direct evidence); *Williams v. Gen. Motors Corp*., 656 F.2d 120, 130

(5th Cir. 1981) (direct evidence would be a paper scrap with the notation "Lay-off Too Old" beside a plaintiff's name).

This Circuit recognizes that not every comment related to an individual's age constitutes direct evidence of discrimination. *See, e.g., Beaver v. Rayonier Inc*., 188 F.3d 1279, 1285–86 (11th Cir. 1999) (finding that decision-maker's comment that he wanted to attract "younger, engineer-type employees or supervisors" in reduction-in-force case did not rise to level of "direct" evidence of discrimination); *Young v. Gen. Foods Corp*., 840 F.2d 825, 829 (11th Cir. 1988) (comments that employee lacked wherewithal to perform job, moved in slow motion, and was not proactive or aggressive did not constitute direct evidence of discrimination); *Barnes v. SW Forest Indus., Inc.*, 814 F.2d 607, 610–11 (11th Cir. 1987) (statement that plaintiff would have to take another physical examination "and at your age, I don't believe you could pass it," while "inappropriate and condescending," was not direct evidence of discrimination); *Mauter v. Hardy Corp*., 825 F.2d 1554, 1558 (11th Cir. 1987) (statement that company was going to "weed out the old ones" was insufficient to present direct evidence of discriminatory intent when made by individual who played no part in the decision to terminate the plaintiff); *but see Van Voorhis*, 512 F.3d at 1300 (decision maker's comment that he "didn't want to hire an old pilot" was direct evidence of age discrimination).

Although a closer call, the court finds this case more akin to the facts in *Van Voorhis*. In reversing summary judgment for the employer in that case, the Eleventh Circuit held that the comment by the manager in charge of hiring that he did not want to hire an old pilot was direct evidence of discrimination on the basis of age. *Van Voorhis*, 512 F.3d at 1300. In a light most favorable to Dixon, Willis told council member Holt immediately after Dixon was hired that Dixon was too old for the position and stated to Crenshaw that he wanted to get rid of what he did not want–an old woman. And ultimately Willis, with the support of council members who owed him political favors, made the decision to terminate her. These are the type of blatant remarks that arguably constitute direct evidence of age

16

discrimination. The Court is mindful that some of the evidence long pre-dates Dixon's dismissal, however, the repeated and continuing nature of Willis' animosity toward both Plaintiffs with respect to Dixon supports consideration of the entire history of the employment relationship.

Even where direct evidence of discrimination exists, a plaintiff must still present evidence of an adverse employment action. *Id.* "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Id.* (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)).  Dixon's termination is an adverse employment action that supports her *prima facie* case of age discrimination based upon direct evidence.  Although the comments long preceded the firing, the evidence is pertinent to understanding and interpreting subsequent events.  Accordingly, the court recommends that summary judgment on her ADEA and AADEA claims be **denied**.

C. *Dixon's Claim of Gender Discrimination*

The City argues that Dixon cannot establish a *prima facie* case on her gender discrimination claim. To establish a *prima facie* Title VII discrimination claim, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably or that she was replaced with a person outside her protected class; and (4) she was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  The City concedes she satisfies the first two elements. (Doc. 22 at 22).  As to the third element, the City contends Dixon cannot point to a similarly situated employee that was treated more favorably.  The Court finds even if that were the case, she was replaced by a male which satisfies the third element.  As for the final element, the City does not specifically argue Dixon was unqualified for the position but relies upon the findings of the Dana Hill investigation to

support its decision to terminate Dixon.  At a minimum there is a dispute on this element, and in a light most favorable to Dixon, the court finds she can establish a *prima facie* case of gender discrimination.

Thus, the burden then shifts to the City to articulate a legitimate, non-discriminatory reason for her termination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The City cites as non-discriminatory reasons the complaints made by numerous officers about Dixon and Crenshaw, which prompted an investigation conducted by Dana Hill, the results of which the City relied upon to support its decision to remove Dixon from her position.

In response, Dixon claims the reasons are pretextual and offers evidence demonstrating the stated reason is pretext for discrimination.  *Id.*  She submits that the officers' complaints about Dixon and Crenshaw were made due to prompting by Willis in exchange for political favors.  She further contends that the investigation was a sham orchestrated by Willis to accelerate his plan to get rid of her.  These are issues of disputed fact that cannot be resolved on this motion.  Accordingly, the court recommends the City's motion for summary judgment as to Dixon's Title VII gender discrimination claim be **denied**.

D. *Crenshaw's Retaliation Claims*

Crenshaw alleges Willis wanted to remove Dixon from her position as Chief of Police because she was "an old, overweight woman," (Doc. 1, ¶ 6), and Crenshaw was retaliated against for refusing to be a participant in Willis' unlawful plan.  Under Title VII, it is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).  "[T]o successfully allege a *prima facie* retaliation claim under either Title VII [or] the ADEA …, a plaintiff must show that (1) [he] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted).

On the first element, the City argues it is unclear that Crenshaw "opposed" the alleged discriminatory conduct.  The City submits the vague assertion Crenshaw "refused" to help get rid of Chief Dixon is insufficient to communicate his belief that discriminatory conduct was occurring.  To prove that he was engaged in statutorily protected activity, Crenshaw must demonstrate he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  *Id.* (citing *Little v. United Tech., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997)).   The *Little* court explained the standard as follows:

> [A] plaintiff's burden under this standard has both a subjective and an objective component.  A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

Crenshaw's retaliation claims based upon alleged age and gender discrimination are not wholly tied to the outcome of Dixon's discrimination claims.  "A plaintiff …need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement would not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances."  *Id.*  The essence of a retaliation claim under Title VII is that the plaintiff is being punished for participating in any significant way in a suit challenging the employer's practices, regardless of the ultimate success of that endeavor.  *See, e.g., Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989).  A plaintiff's burden under this standard has both a subjective and an objective component.  *Little*, 103 F.3d at 960.  Thus, Crenshaw must show that he subjectively (that is, in good faith) believed that the City was engaged in unlawful employment practices, and also that his belief was objectively reasonable in light of the facts and circumstances of the case.

The evidence establishes that Crenshaw and Willis engaged in a conversation in which Willis stated the City Council gave him something he did not want—"an old, overweight woman." In that same conversation, Willis referred to Crenshaw as "his man" and enlisted Crenshaw to "help [him] get rid of her." Several months later after Crenshaw did nothing to aid Willis in getting rid of Dixon, Willis confronted Crenshaw again and said, "I thought you were going to help me out." Crenshaw submits he expressed his opposition when he told Willis that he was "not going to be a part of that." (Doc. 21-8, 67:11-18).

As noted by Defendant's motion, Title VII does not define "opposition." The Eleventh Circuit, however, has recognized that even an employee's request to speak with a supervisor who had reportedly made a discriminatory remark "expressed [a] resistance to or antagonism toward the substance of the statement" and therefore constituted "an announcement of [the employee's] opposition." *Demers v. Adams Homes of NW Fla.*, 321 F. App'x 847, 852 (11th Cir. 2009).[6] Crenshaw testified he told Willis he "was not made that way" and he "would not be a part of that." In a light favorable to Crenshaw, this pronouncement to Willis demonstrates his opposition to Willis' discriminatory conduct.

There is evidence to establish that Willis commented to a City Council member that Dixon was a woman and too old for the position. (Doc. 23-2, 15:8–13). Willis commented to several other witnesses his intention and desire to get rid of Dixon. The Court finds that Crenshaw's belief that Willis was engaging in discriminatory employment practices was not only subjectively reasonable, but also objectively reasonable in light of the facts and record presented. Accordingly, the Court concludes these events are sufficient on this motion to establish that Crenshaw engaged in a statutorily-protected act of opposing his employer's alleged discriminatory employment practices.

---

[6] Unpublished opinions are not considered binding precedent, but they may be persuasive authority. 11th Cir. R. 36-2.

The second factor in the analysis considers whether the employee suffered an adverse employment action. Crenshaw claims he suffered two adverse employment actions—being placed on administrative leave and being demoted. The City argues that paid administrative leave cannot constitute an "adverse employment action" for purposes of a Title VII retaliation claim. Courts in this circuit have explicitly recognized a plaintiff who was suspended with pay for thirty days was subjected to an adverse employment action. *See Horne v. Russell County Comm'n*, 379 F. Supp. 2d 1305, 1329 (M.D. Ala. 2005), aff'd, 180 F. App'x 903 (11th Cir. 2006) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920 (11th Cir. 1993)). Thus, paid leave can constitute an adverse employment action.

Moreover, there appears no dispute, that Crenshaw's demotion from Deputy Chief of Police to Lieutenant constitutes an adverse employment action. *See* (Doc. 23-6). Accordingly, the court finds Crenshaw has presented sufficient evidence to support the second element of his claim for retaliation.

The final element requires a plaintiff demonstrate a causal connection exists between participation in the protected activity and the adverse employment action. To do this, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The City contends that the administrative leave was related to the pending investigation and was not motivated by retaliation. The City further argues Crenshaw cannot present evidence showing a causal connection between his purported opposition in 2010 and his being placed on administrative leave four years later in 2014. The cases relied on by the City to support its argument that even three months is too long to establish causation can be factually distinguished because they involved situations in which the only evidence of causation was the temporal proximity, which in those cases was not enough. Here, Crenshaw cites to incidents of demeaning comments by Willis and evidence of repeated threats by Willis occurring almost weekly up until the time of Crenshaw's administrative leave. In a light favorable to Crenshaw, these incidents establish a causal connection to support a *prima facie* claim of retaliation.

21

Even if Crenshaw can establish a *prima facie* case of retaliatory demotion, the City contends it has articulated a legitimate, non-retaliatory reason for his demotion, namely the results of the independent investigation. *See McDonnell Douglas*, 411 U.S. at 802. If an employer proffers legitimate reasons, the burden shifts back to the employee to establish the reasons given are pretextual. *Id.* Like Dixon, Crenshaw contends the reasons given are pretextual because Willis was the one orchestrating the investigation and exchanged political favors for officers' complaints about Dixon and Crenshaw to bolster the City's investigation. The City denies Willis' involvement in the investigation. The court finds the existence of disputed issues of material fact preclude summary judgment on this issue. Accordingly, the court recommends the City's motion for summary judgment as to the retaliation claims of Crenshaw be **denied**.

## V.   CONCLUSION AND RECOMMENDATION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's motion for summary judgment (Doc. 21) is due to be **DENIED**.

It is **ORDERED** that the parties shall file any objections to the said Recommendation on or before June 14, 2017. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982).

**DONE** and **ORDERED** this 1st day of June 2017.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE